IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL SWEIG,<br><br>      Plaintiff,<br><br>v.<br><br>ABM INDUSTRIES, INCORPORATED,<br><br>      Defendant. | No. 08-cv-271<br><br>Judge Joan Humphrey Lefkow<br><br>Magistrate Judge Michael T. Mason |

**PLAINTIFF'S RESPONSE
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Defendant's Motion to Dismiss must fail as a matter of fact and law. The threshold legal standard for dismissal under Rule 12(b)(6) is high. But even if it were not, Defendant still cannot prevail on its motion.

ABM argues that the Sales and Marketing Employment Agreement (the "Sales and Marketing Agreement")[1] between Mr. Sweig and ABM precludes Mr. Sweig's right to a finder's fee for his role in ABM's acquisition of OneSource Services, Inc. ("OneSource"), even though Mr. Sweig was promised a one-percent fee by ABM's Chief Executive Officer. The intent and scope of the Sales and Marketing Agreement relate to Mr. Sweig's activities in preserving and developing *customers* for ABM, not his assistance in the acquisition of ABM's largest competitor. The Sales and Marketing Agreement's express language contemplates that Mr. Sweig may enter into other simultaneous employment contracts with ABM for additional services. What does that language mean if not precisely what occurred here? Mr. Sweig entered into an oral agreement with ABM to assist it in its acquisition of OneSource, using Mr. Sweig's

---

[1] The Sales and Marketing Agreement is attached hereto as Exhibit A ("Ex. A").

unique connections with OneSource's Chairman and majority stockholder. ABM now refuses to honor that agreement.

ABM's fallback position is that, even if Mr. Sweig's actions in bringing OneSource and ABM together were outside the scope of Mr. Sweig's Sales and Marketing Agreement, ABM's oral commitment to pay him a one-percent business opportunity fee fails for indefiniteness. ABM's argument fails because the alleged price term (one percent of the acquisition price of OneSource) is sufficiently definite for the Court to determine what the parties intended and enforce the contract. ABM's argument also ignores Mr. Sweig's quantum meruit claim (Count II of the Sweig Complaint). Accordingly, even if the Court were to find that the price term was unenforceable with respect to Mr. Sweig's breach of contract claim, Mr. Sweig could nevertheless prevail on his quantum meruit claim.

In addition, ABM's claim that the oral agreement between Sweig and ABM is barred by the Illinois Business Brokers Act is groundless. The Act's plain language does not apply to ABM, OneSource, or Mr. Sweig. Neither ABM nor One Source is domiciled in Illinois, a prerequisite for the Act's application. Nor does Sweig regularly engage in the business of brokering, and, hence, the Act does not apply to him. Simply put, the Act has no application to the parties or transaction at issue here.

In any event, there are sufficient factual issues raised by the pleadings to preclude the draconian relief sought by ABM's Motion to Dismiss and, therefore, it should be denied.

**I.      FACTUAL SUMMARY OF THE COMPLAINT**

ABM claims that Mr. Sweig's role in the transaction between ABM and OneSource was limited to "a single telephone call—regarding a possible deal between ABM and OneSource" (ABM's Memo at 2) and that "Plaintiff does not allege that he provided any additional work or

- 3 -

services in connection with the deal between ABM and OneSource." (*Id.* at 2-3.) These claims deliberately ignore the facts and key allegations of the Complaint.

The Complaint specifically alleges that Mr. Sweig was instrumental in identifying OneSource as an acquisition target for ABM (Compl. ¶ 10), that Mr. Sweig had numerous conversations with ABM's President and Chief Executive Officer, Henrik C. Slipsager ("Slipsager"), and assessed ABM's interest in strategic growth through acquiring OneSource (*Id.* at ¶¶ 10-17), and that Mr. Sweig met with Slipsager to discuss the potential acquisition of OneSource by ABM (Compl. ¶ 17). During that meeting, Slipsager assured Mr. Sweig that he would receive a one-percent (1%) business opportunity fee if the acquisition was completed. (*Id.*)

Mr. Sweig also introduced Slipsager to OneSource's Chairman and majority stockholder, Lord Michael Ashcroft. Mr. Sweig had a long-standing business relationship with Lord Ashcroft. (Compl. ¶¶ 12-13.) Slipsager had never met Lord Ashcroft prior to Mr. Sweig's introduction and, as a result, could not readily contact Lord Ashcroft about a potential acquisition. (*Id.* at ¶ 16.) Mr. Sweig's long-standing relationship with Lord Ashcroft ensured that ABM's offer to purchase OneSource would be seriously considered by Lord Ashcroft. (*Id.* at ¶ 16.) Mr. Sweig also facilitated discussions between Slipsager and Lord Ashcroft that led to the acquisition of OneSource by ABM. (*Id.* at ¶¶ 13, 15.)

There can be no question that Mr. Sweig played an essential role in ABM's acquisition of OneSource. ABM's unsupported arguments to the contrary undermine its credibility and do not support a Motion to Dismiss.

## II. ARGUMENT

### A. Standard on Motion to Dismiss

"Granting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interest of justice." *Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir. 1986). "The Federal Rules of Civil Procedure erect a powerful presumption against rejecting pleadings for failure to state a claim." *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381, 386 (9th Cir. 1985).

In ruling on a motion to dismiss, the district court must review all facts alleged in the complaint and any reasonable inferences drawn therefrom in the light most favorable to the plaintiff. *Marshall-Mosby v. Corp. Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000); *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993). The court should dismiss a complaint only where "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Chaney v. Suburban Bus. Dev.*, 52 F.3d 623, 627 (7th Cir. 1995).

Application of these standards to the Complaint now before the Court warrants denial of ABM's Motion.

### B. Mr. Sweig's Claims Fall Outside the Scope of the Sales and Marketing Agreement

As is set forth in the Complaint, Mr. Sweig is the former Chairman and Chief Executive Officer of two businesses (Lakeside and Lakeside Michigan) that provided janitorial and facility maintenance services to commercial and industrial facilities. (Compl at 1.) In 2002, ABM acquired Lakeside and Lakeside Michigan. Mr. Sweig entered into the Sales and Marketing Agreement with ABM in order to preserve the Lakeside customers and to generate new customers for ABM. (*Id.* at ¶ 6-8.)

ABM first argues that Mr. Sweig's services with regard to identifying and introducing OneSource to ABM for acquisition fall within the scope of the Sales and Marketing Agreement. (Memo at 4.) ABM next argues that even if Mr. Sweig's services fall outside the scope of the Sales and Marketing Agreement, his claims are barred because the Sales and Marketing Agreement contains an integration clause. (*Id.* at 6.) Neither of these arguments has merit or supports dismissal of the Complaint.

### 1. ABM Mischaracterizes Mr. Sweig's Duties Under the Sales and Marketing Agreement

ABM's interpretation of the "scope" of the Sales and Marketing Agreement is contrary to the intent of the agreement and its plain language. The intent of the Sales and Marketing Agreement is clear from its language and context. Even the title of the agreement—the Sales and Marketing Employment Agreement—is contrary to ABM's contention. The parties entered into the Sales and Marketing Agreement in conjunction with the sale of the Lakeside business to ABM. The intent was that Mr. Sweig would assist in maintaining the business relationships with the Lakeside customers after ABM acquired those two companies and assist ABM in developing new customers. Under any interpretation, Mr. Sweig's assistance in ABM's acquisition of a *competing company* falls far outside the intent or scope of the Sales and Marketing Agreement.

ABM misstates some, and utterly omits other, important portions of the Sales and Marketing Agreement that define Mr. Sweig's role and responsibilities under that agreement. For example, ABM selectively quotes portions of Section C that define Mr. Sweig's duties, claiming that Mr. Sweig was responsible for "building new business relationships for ABM." (ABM's Memo., at 5.) However, ABM omits language from the very same section of the Sales and Marketing Agreement that makes it clear that these new business relationships were related to new customer accounts, not acquisition targets. In the context of Section C it is clear that the

"business relationships" that Mr. Sweig was tasked to "build[]" were the "new customer accounts" for ABM.[2]

Although generating new *customer* accounts is a duty included in the Sales and Marketing Agreement, the responsibility for acquiring a multi-million-dollar *competitor* is far beyond that duty. The only reasonable conclusion is that Mr. Sweig's efforts in connection with ABM's acquisition of OneSource were wholly unrelated to his duties and responsibilities under the Sales and Marketing Agreement.[3]

Further, the provision in the Sales and Marketing Agreement that Mr. Sweig was to perform duties "as assigned from time to time by the Chief Executive Officer of [ABM]" cannot be read in isolation as ABM suggests. (ABM's Memo., at 5.) Instead, that provision must be read in conjunction with the other provision in Section C of the Sales and Marketing Agreement stating that Mr. Sweig was to be assigned "sales and marketing duties and responsibilities" for the "generation of new customers and new customer accounts." The only fair reading of this provision is that the sales and marketing duties that were to be assigned by ABM's CEO would relate to generating new customers for ABM.

---

[2] Section C of the Sales and Marketing Agreement states: "[Mr. Sweig] shall be expected to assume and perform such sales and marketing duties and responsibilities as are assigned from time-to-time by the Chief Executive Officer of [ABM] to whom [Mr. Sweig] shall report and be accountable. Such sales and marketing duties and responsibilities to be assumed and performed by [Mr. Sweig] shall include, without limitation, generation of new customers and new customer accounts for [ABM] and its affiliates, and the preservation and building of new and existing business relationships of [ABM] and its affiliates." (Sales and Marketing Agreement, Section C, Ex. A.)

[3] In addition, Agreement provides that, "in connection with [Mr. Sweig's] employment hereunder," ABM may disclose confidential "specific customer data." (Ex. A, Sales and Marketing Agreement, Section K, at p. 3.) Thus, the fact that Mr. Sweig might be provided "customer data" in connection with his employment under the Agreement further proves that Mr. Sweig was retained to assist ABM with its janitorial and building maintenance customers, and not for the purposes of assisting ABM to acquire other businesses.

Based upon a reading of the entire Sales and Marketing Agreement, rather than taking certain provisions out of context as ABM does in its Motion, it is clear that Mr. Sweig's role as the procuring cause of ABM's acquisition of OneSource is outside the scope of the agreement. In any event, to the extent that there is any ambiguity regarding the scope of the Sales and Marketing Agreement, it should be construed against ABM, the drafter of the agreement. *See Duldulao v. Saint Mary of Nazareth Hosp. Center*, 115 Ill.2d 482, 493, 505 N.E.2d 314, 319 (1987).

> **2.    The Sales and Marketing Agreement's Integration Clause Is Inapplicable to the Subsequent Agreement by ABM to Compensate Mr. Sweig for His Efforts in Connection with the OneSource Acquisition**

The integration clause in the Sales and Marketing Agreement is not relevant here, as Mr. Sweig's activities with regard to ABM's purchase of One Source were not "pursuant to [the] Agreement." Instead, the activities for which Mr. Sweig seeks compensation were outside the Sales and Marketing Agreement and were performed pursuant to a separate agreement related solely to Mr. Sweig's assistance in ABM's acquisition of OneSource. Notably, the Sales and Marketing Agreement, which ABM attempts to use as a bar to the oral agreement, actually recognizes the likelihood that ABM would enter into separate agreements with Mr. Sweig for purposes outside the scope of the Sales and Marketing Agreement.

Section F(2)(b) of the Sales and Marketing Agreement specifically states that:

> if at any time during the Term, [Mr. Sweig] is a party to any employment agreement, *in addition to this Agreement*, with [ABM] . . . any benefits to which [Mr. Sweig] may be entitled to hereunder . . shall be offset by any other substantially similar benefits [Mr. Sweig] receives pursuant to *such other employment agreement* so long as *such other employment agreement* is in effect and for so long as such other benefits are substantially similar in level and in scope as those provided hereunder.

(Ex. A, at p. 2 (emphasis added).)

This unambiguous language demonstrates that the parties contemplated the possibility of other, subsequent agreements between ABM and Mr. Sweig. Those other agreements, such as the one at issue here, are separate from, and not governed by, the Sales and Marketing Agreement.

In any event, subsequent oral agreements have long been recognized in Illinois, regardless of whether the earlier written contract contained an integration clause. Illinois courts have consistently held that "[t]he law seems well settled; the terms of a written contract can be modified by a subsequent oral agreement even though, as in this case, the contract precludes oral modifications." *See Tadros v. Kuzmak*, 277 Ill. App. 3d 301, 312, 660 N.E.2d 162, 170 (1995) (citing *A.W. Wendell & Sons, Inc. v. Qazi,* 254 Ill. App. 3d 97, 105, 626 N.E.2d 280, 288 (1993)); *Falcon, Ltd v. Corr's Natural Beverages, Inc.,* 165 Ill. App. 3d 815, 821, 520 N.E.2d 831, 835 (1987) (enforcing oral agreement regarding new commission rates, although prior written contract contained integration clause and precluded oral modification); *Estate of Kern v. Handelsman,* 115 Ill. App. 3d 789, 450 N.E.2d 1286 (1983) (denying motion for summary judgment because a triable issue of fact existed as to whether the written agreement containing integration clause was modified by a subsequent oral agreement). Accordingly, the integration clause of the Sales and Marketing Agreement has no bearing on the case at hand.

The two cases cited by ABM, *Fox v. The Montell Corp.*, 01 C 299, 2001 WL 293632 (N.D. Ill. Mar. 19, 2001), and *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 464 (1999), are inapplicable because the integration clauses in those cases were applied to *prior* oral agreements and not subsequent unrelated oral agreements, as is the case here. *See Fox,* 2001 WL 293632, at *2; *Air Safety*, 185 Ill. 2d at 464-65. ABM's later agreement to pay Mr. Sweig for his role in connection with the OneSource acquisition is a totally separate contract and therefore

CHICAGO/#1740771.14

does not modify the earlier Sales and Marketing Agreement. Accordingly, the Sales and Marketing Agreement does not bar Mr. Sweig's claims.

### C. The Agreed-Upon One-Percent Fee Is Not Void for Indefiniteness

ABM next argues that its agreement to pay Mr. Sweig a one-percent business opportunity or finder's fee is void for indefiniteness. (ABM's Memo., at 8-10.) ABM argues that because the Complaint refers to a "customary" or "reasonable" fee, its oral agreement to pay Mr. Sweig is so "vague and undefined" as to be unenforceable. (ABM's Memo., at 9.)

In making this argument, ABM ignores numerous allegations in the Complaint that reference the agreed-upon one-percent (1%) fee that Mr. Sweig seeks as compensation as the procuring cause of ABM's acquisition of OneSource. Those allegations include that:

- "Slipsager assured Sweig that he would receive a one percent (1%) business opportunity fee if the deal closed." (Compl. ¶ 17);

- "A customary finder's or business opportunity fee under such circumstances is approximately one percent (1%) of the purchase price of the acquired company." (Compl. ¶ 24);

- "The customary finder's or business opportunity fee for Sweig's efforts described herein in connection with ABM's acquisition of OneSource is one percent (1%) of the $365 million purchase price paid by ABM for OneSource, or $3.65 million." (Compl. ¶ 32).

Remarkably, ABM asserts that the Complaint's allegation that "Slipsager assured Sweig that he would receive a one percent (1%) business opportunity fee if the deal closed" is somehow "buried" in the Complaint and is "aberrant." (ABM's Memo., at 3, 9.) It is unclear how any allegation could be "buried" in a Complaint. In any event, the supposedly "buried" allegations clearly state that ABM orally agreed to pay Mr. Sweig a definite amount—a one-percent (1%) fee. (Compl. ¶¶ 10, 12, 14, 17.)

Finally, ABM's contention is contrary to well-established Illinois law. "A contract is sufficiently definite and certain to be enforceable if the court is able from its terms and

- 9 -

provisions to ascertain what the parties intended, under proper rules of construction and applicable principles of equity." *Halloran v. Dickerson*, 287 Ill. App. 3d 857, 867-68, 679 N.E.2d 774 (1997). Thus, as a general rule, "[t]he determination that an agreement is sufficiently definite is favored"; finding a contract unenforceable for indefinites is "at best, a last resort." 17 AM. JUR. 2D CONTRACTS § 193.

Illinois courts have held that similar contract terms were not so indefinite to render the contract unenforceable. *See, e.g.*, *Miller v. Bloomberg*, 26 Ill. App. 3d 18, 324 N.E. 2d 207 (1st Dist. 1975) (affirming trial court order of specific performance of an option to purchase real estate at the "prevailing market price"; price term sufficiently definite to sustain an action for specific performance). The Seventh Circuit, in applying Illinois law, held that "[w]here a broker is engaged and no amount or rate of commission is agreed on, there is an implied agreement, under Illinois law, to pay the usual and customary commission for similar transactions." *John F. Fleming, Inc. v. Beutel*, 395 F.2d 21, 23 (7th Cir. 1968) (reversing grant of summary judgment in favor of seller and against broker, finding that the seller had agreed, by implication, to pay the broker the usual and customary commission if he procured a ready, willing and able purchaser).

Moreover, a contract is enforceable so long as there is reasonable certainty as to the terms of the agreement. *See Wait v. First Midwest Bank/Danville*, 142 Ill. App. 3d 703, 708, 491 N.E.2d 795, 801 (1986) (holding that an oral contract to loan an unspecified amount of money is not void for indefiniteness if it contemplated the terms upon which the future loan would be made). Therefore, Mr. Sweig's allegations that ABM agreed to pay him a one-percent fee are sufficiently definite to withstand a motion to dismiss.

ABM's reliance on *Northeast Ill. Regional Commuter RR Corp. v. Kiewit Western Co.*, 396 F. Supp. 2d 913, 921 (N.D. Ill. 2005), is misplaced, as that case is readily distinguishable. There, in ruling summary judgment, the court determined that an agreement to perform certain repair work and to "spare no expense" was too vague and indefinite to create a binding and enforceable contract. ABM's assurances to Mr. Sweig that he would receive "a one percent (1%) business opportunity fee if the deal closed," (Compl. ¶ 17), are clear and are far more definite than the "spare no expense" term at issue in *Northeast Ill. Regional Commuter*.

Likewise, *Mellon Bank, N.A. v. Miglin*, 92 C 4059, 1993 WL 281111 (N.D. Ill. Apr. 29, 1993), cited by ABM, is not controlling. There, the court ruled that an agreement to extend payment on a loan "unless and until additional financing was acquired sufficient to develop and construct both contemplated buildings" was indefinite because it was uncertain whether the contingency would ever occur. As a result, the court ruled that the period for the extension was too vague and indefinite. *Id.*, 1993 WL 281111, at *5.

Further, as an alternative to his breach of contract claim, Mr. Sweig has brought a quantum meruit claim (Count II of the Sweig Complaint). Thus, in the event that the Court were to find that the price term was unenforceable with respect to Mr. Sweig's breach of contract claim, Mr. Sweig could nevertheless pursue his quantum meruit claim. *See Bensdorf & Johnson, Inc. v. Northern Telecom, Ltd.*, 58 F. Supp. 2d 874 (N.D. Ill. 1999); *Neuman v. Superior Jamestown Corp.*, 02 CV 7399, 2003 WL 1877635 (N.D. Ill. Apr. 11, 2003).

### D. The Illinois Business Brokers Act Is Not Applicable

ABM concludes its Motion with the erroneous argument that Plaintiff's claims are barred by the Illinois Business Brokers Act (the "Act"). (ABM's Memo., at pp. 10-13.) ABM's argument fails for at least two reasons: First, ABM's argument is directly contradicted by the plain language of the Act and the regulations promulgated under the Act. Second, Mr. Sweig

does not regularly engage in the business of brokering, and therefore, the Act does not apply to him.

ABM acknowledges that the Act applies only when: "the person engaged or sought to be engaged [*i.e.*, ABM] by the business is domiciled in Illinois; or b) when the company or business sought to be sold has its principal place of business in Illinois." (ABM's Memo., at 11, citing 815 ILCS 307/10-30, 10-105.[4]) There is no dispute that the company sold, OneSource, did not have its principal place of business in Illinois. Therefore, ABM acknowledges that "for the Act to apply, ABM must be 'domiciled' in Illinois. (ABM's Memo., at 11.)

Although the Act does not define the term "domiciled," the regulations adopted by the Illinois Secretary of State define the term. Those regulations state that "domicile," when "used in the Act," "means, when applied to a business, that entity's principal place of business and, where applicable, that entity's place of incorporation." 14 Ill. Admin. Code Section 140.51(a).

It is undisputed that ABM is *not incorporated in Illinois* and that *ABM does not maintain its principal place of business in Illinois*. (ABM's Memo., at 11.) Indeed, ABM admits that it "is incorporated in Delaware and has its headquarters in California." (ABM's Memo., at 11.) Therefore, it is clear that the Act is inapplicable.

Cases on point support Mr. Sweig's position. One such case, *Sandra F. Monroe & Co. v. Nat'l Equip. Svcs., Inc.*, No. 99 C 3120, 2000 WL 420746 at *4 (N.D. Ill. Apr. 12, 2000), was cited by ABM. ABM's reference to language from the *Sandra F. Monroe* decision to suggest that "domiciled" should be broadly construed is misleading and taken out of context. (ABM's Memo., at 11-12.) In that case, the Illinois district court ruled that the Act's scope was intended

---

[4] In limiting its scope, the Act states that it "shall apply only when the person engaged or sought to be engaged by the business broker is domiciled in this State or when the company or business sought to be sold has its principal place of business in this State." 815 ILCS 307/10-105.

only to cover "Illinois business, whether they are incorporated in Illinois *or* maintain their principal place of business in Illinois." (*Id.* at 3 (emphasis added).) The district court concluded in *Sandra F. Monroe* that "[a] more logical interpretation would be for 'domiciled' to mean *both* 'principal place of business' *and* 'place of incorporation.' This would be consistent with the purpose of the statute." (*Id.* at 3 (emphasis added).)[5] The Illinois district court made clear: the Act is intended to apply only where the party engaged by the business broker was *either*: (a) incorporated in Illinois *or* (b) maintained its principal place of business in Illinois. *Id.* at 3-4.

ABM requests that this Court expand the scope of the Act to cover it simply because ABM does business in this State. (ABM's Memo., at 12.) Not surprisingly, ABM has cited no case law to support its contention that merely doing business in Illinois results in the corporation's being "domiciled" in the State. Perhaps that's because the Illinois Supreme Court rejected a similar argument in *Martin v. Central Trust Co.*, 327 Ill. 622, 635 (1927). There the Court rejected the contention that two corporations were domiciled in Illinois because they maintained their offices and transacted all of their business in the State.

Moreover, Mr. Sweig does not "engage[] in the business of business brokering," and therefore the Act cannot apply to him. The Act defines a "business broker" as a "person who is required to register under Section 10-10 of this Act. 815 ILCS 307/10-5.10. Section 10-10 of the Act, 815 ILCS 307/10-10, provides that only persons "engaging in the business of business brokering" are required to register with the Illinois Secretary of State. Mr. Sweig does not regularly engage in the business of brokering and the ABM/OneSource acquisition was an

---

[5] *See also* Remarks of Rep. Rutherford, Debate of Illinois House of Representatives on Illinois Business Brokers Act, May 22, 1995 Transcript at 260-61 (purpose of Act is to protect the citizenry of Illinois), *cited in Sandra F. Monroe*, 2000 WL 420746 at *3. Where, as here, ABM admittedly is neither incorporated in Illinois nor maintains its principal place of business in Illinois, it is not a citizen of the state to which the Act may apply.

CHICAGO/#1740771.14

- 14 -

isolated, one-time occurrence for Mr. Sweig.  Therefore, the Act cannot be applied against Mr. Sweig.[6]

### III.   CONCLUSION

For the foregoing reasons, ABM's Motion to Dismiss should be denied.

Respectfully submitted,

MICHAEL SWEIG


By: s/ Bruce A. Radke
        One of His Attorneys

Diane M. Kehl, Esq.
Bruce A. Radke, Esq.
Brian W. Ledebuhr, Esq.
VEDDER PRICE P.C.
222 North LaSalle Street, Suite 2600
Chicago, IL  60601-1003
Telephone:  312/609-7500
Facsimile:  312/609-5005

Dated:  February 21, 2008

---

[6] *Thomas v. Daubs,* 291 Ill. App. 3d 682, 684 N.E.2d 1011 (5th Dist. 1997), cited by ABM, is distinguishable.  That case involved the Illinois Real Estate License Act, and not the Illinois Business Brokers Act.

**CERTIFICATE OF SERVICE**

The undersigned certifies that he caused a copy of the foregoing PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS to be served upon:

Jennifer A. Kenedy, Esq.
Simon Fleischmann, Esq.
LOCKE, LORD, BISSELL & LIDDELL, LLP
111 S. Wacker Drive
Chicago, IL 60606

by electronic means on February 21, 2008.

s/ Bruce A. Radke