## SALES AND MARKETING EMPLOYMENT AGREEMENT

THIS SALES AND MARKETING EMPLOYMENT AGREEMENT ("Agreement") is made as of July 12, 2002, by and between **Michael Sweig** ("Executive"), and **ABM Industries Incorporated**, a Delaware corporation ("Company"), for itself and on behalf of its subsidiary corporations as applicable herein.

WHEREAS, Executive is presently the Chairman and Chief Executive Officer of Lakeside Building Maintenance, Inc., an Illinois corporation, ("Lakeside Illinois") and the Chief Executive of Lakeside Building Maintenance of Michigan L.C., a Michigan limited liability company ("Lakeside Michigan"), which are both engaged in the janitorial and janitorial related services business, and

WHEREAS, Executive is experienced in the administration, finance, marketing, and/or operation of such services, and

WHEREAS, concurrently with the execution of this Agreement, Company is acquiring substantially all of the assets, business and goodwill of Lakeside Illinois and Lakeside Michigan, pursuant to that certain Asset Purchase Agreement, dated as of July 10, 2002, among Company, Lakeside Illinois, Lakeside Michigan, Executive, and others (the "Purchase Agreement"), and

WHEREAS, Company and its affiliates have invested significant time and money to develop proprietary trade secrets and other confidential business information, as well as invaluable goodwill among its customers, sales prospects and employees, and

WHEREAS, Executive wishes to be employed by Company, and to utilize such proprietary trade secrets, other confidential business information and goodwill, and

WHEREAS, Company has disclosed or will disclose to Executive such proprietary trade secrets and other confidential business information which Executive will utilize in the performance of this Agreement;

NOW THEREFORE, Executive and Company agree as follows:

A.  **EMPLOYMENT; PURCHASE AGREEMENT:** Company hereby agrees to employ Executive, and Executive hereby accepts such employment, on the terms and conditions set forth in this Agreement. This Agreement is ancillary to the Purchase Agreement, which contains certain non-competition and non-solicitation obligations which are applicable to Executive, as well as certain "earnout" and other payment provisions pertaining to the future earnings of Company.

B.  **TITLE:** Executive's title shall be Special Assistant to the Chief Executive Officer of the Company, subject to modification as mutually agreed upon by both Company and Executive.

C.  **DUTIES & RESPONSIBILITIES:** Executive shall be expected to assume and perform such sales and marketing duties and responsibilities as are assigned from time-to-time by the Chief Executive Officer of Company to whom Executive shall report and be accountable. Such sales and marketing duties and responsibilities to be assumed and performed by Executive shall include, without limitation, generation of new customers and new customer accounts for Company and its affiliates, and the preservation and building of new and existing business relationships of Company and its affiliates.

D.  **TERM OF AGREEMENT:** Employment hereunder shall be deemed effective as of July 12, 2002 and shall continue for a term of ten years thereafter (the "Term"), unless sooner terminated pursuant to Paragraph O hereof.

E.  **PRINCIPAL OFFICE:** During the Term, Executive shall be based at a Company office located in Chicago in the State of Illinois ("State of Employment"), or such other location as shall be mutually agreed upon by Company and Executive.

F.  **COMPENSATION:** Company agrees to compensate Executive, and Executive agrees to accept as compensation in full, for Executive's assumption and performance of duties and responsibilities pursuant to this Agreement:

   1.  SALARY: A salary paid in equal installments of no less frequently than semi-monthly at the annual rate set forth in Paragraph X.1 hereof ("Base Salary").

   2.  FRINGE BENEFITS:

       a.  Executive shall receive the then current fringe benefits generally provided by Company to the President and Chief Executive Officer of Company; provided that Company shall pay one hundred percent (100%) of the premiums on behalf of Executive and his spouse for such health insurance benefits. Such benefits may include, but not be limited to, group health benefits, long-term disability benefits, group life insurance, sick leave and vacation. In addition, Company will reimburse Executive for parking expenses incurred by Executive at Executive's permanent residence and at the principal office of Company. Each of these fringe benefits is subject to the applicable Company policy at all times. Executive expressly agrees that should he terminate employment with Company for the purpose of being re-employed by a Company affiliate, he shall "carry-over" any accrued but unused vacation balance to the books of the affiliate.

       b.  Notwithstanding the foregoing, if at any time during the Term, Executive is a party to any employment agreement, in addition to this Agreement, with Company or any of its affiliates (including, without limitation, ABM Lakeside, Inc. or American Building Maintenance Co. of Illinois), any benefits to which Executive may be entitled hereunder, other than pursuant to Section X.2 and other than payment of the Base Salary, shall be offset by any substantially similar benefits Executive receives pursuant to such other employment agreement for so long as such other employment agreement is in effect and for so long as such other benefits are substantially similar in level and in scope as those provided hereunder.

       c.  Company reserves the right to add, increase, reduce or eliminate any fringe benefit at any time, but no such benefit or benefits shall be reduced or eliminated as to Executive unless generally reduced or eliminated as to comparable executives within the Company.

       d.  Notwithstanding the foregoing, Company shall provide Executive and his spouse with the health insurance benefits described in this Paragraph F, and shall pay (100%) of the premiums on behalf of Executive and his spouse for such health insurance benefits, for a period of ten (10) years from the effective date of this Agreement; provided that, upon Executive's voluntarily termination of this Agreement or his employment hereunder (other than a voluntary termination resulting primarily from Executive being advised by his physician in writing (a copy of which shall be provided to ABM Industries Incorporated) that, in such physician's professional judgment, Executive should permanently discontinue the performance of his duties hereunder due to his physical illness or health condition), Company's obligation to provide such health insurance benefits or otherwise pay any premiums on behalf of Executive or his spouse for such health insurance benefits shall cease immediately.

   3.  RELOCATION: Company agrees that Executive shall be entitled to relocate his permanent residence to another location in the United States after the date hereof and in such event,

Sales & Mktg w/ SERP
DOCSSF1:615879.9
3710-20 GH3

INITIALS: EXECUTIVE _____ COMPANY _____

        Company agrees to pay the reasonable cost of coach air fare on a major national carrier incurred by Executive in commuting to Chicago, Illinois to render services hereunder.

G. **PAYMENT OR REIMBURSEMENT OF BUSINESS EXPENSES:** Company shall pay directly or reimburse Executive for reasonable business expenses of Company incurred by Executive in connection with Company business, and approved in writing by the person(s) with the title set forth in Paragraph C hereof, upon presentation to such person(s) by Executive within sixty (60) days after incurring such expense of an itemized request for payment including the date, nature, recipient, purpose and amount of each such expense, accompanied by receipts for all such expenses in excess of Twenty-Five Dollars ($25) each.

H. **BUSINESS CONDUCT:** Executive shall comply with all applicable laws pertaining to the performance of this Agreement, and with all lawful and ethical rules, regulations, policies, codes of conduct, procedures and instructions of Company, including but not limited to the following:

    1. GOOD FAITH: Executive shall not act in any way contrary to the best interest of Company.

    2. BEST EFFORTS: During his employment hereunder, Executive shall not at any time be directly or indirectly employed by, own, operate, assist or otherwise be involved, invested or associated in any business that is similar or competitive to any business of Company; provided, however, that the foregoing shall not prohibit Executive from participating in managing the affairs of Lakeside Illinois and Lakeside Michigan, so long as such activities do not interfere with Executive's duties and responsibilities hereunder.

    3. VERACITY: Executive shall make no claims or promises to any employee, supplier, contractor, customer or sales prospect of Company that are unauthorized by Company or are in any way untrue.

    4. DRIVER'S LICENSE: Executive shall have and carry a valid driver's license issued by his or her state of domicile or the State of Employment hereunder and a driver's permit issued by the Company whenever Executive is driving any motor vehicle in connection with Company business.

I. **NO CONFLICT:** Executive represents to Company that Executive is not bound by any contract with a previous employer or with any other business that might prevent Executive from entering into this Agreement. Executive further represents that he or she is not bound by any other contracts or covenants that in any way restrict or limit Executive's activities in relation to his or her employment with Company that have not been fully disclosed to Company prior to the signing of this Agreement.

J. **COMPANY PROPERTY:** Company shall, from time to time, entrust to the care, custody and control of Executive certain of Company's property, such as motor vehicles, equipment, supplies and documents. Such documents may include, but shall not be limited to customer lists, financial statements, cost data, price lists, invoices, forms, electronic files and media, mailing lists, contracts, reports, manuals, personnel files or directories, correspondence, business cards, copies or notes made from Company documents and documents compiled or prepared by Executive for Executive's use in connection with Company business. Executive specifically acknowledges that all such documents are the property of Company, notwithstanding their preparation, care, custody, control or possession by Executive at any time(s) whatsoever.

K. **GOODWILL & PROPRIETARY INFORMATION:** In connection with Executive's employment hereunder:

    1. Executive agrees to utilize and further Company's goodwill ("Goodwill") among its customers, sales prospects and employees, and acknowledges that Company may disclose to Executive and Executive may disclose to Company, proprietary trade secrets and other confidential information not in the public domain ("Proprietary Information") including but not limited to specific customer data such as: (a) the identity of Company's customers and sales prospects, (b) the nature, extent, frequency, methodology, cost, price and profit associated with its services and products purchased

Page 4 of 9

from Company, (c) any particular needs or preferences regarding its service or supply requirements, (d) the names, office hours, telephone numbers and street addresses of its purchasing agents or other buyers, (e) its billing procedures, (f) its credit limits and payment practices, and (g) its organizational structure.

2. Executive agrees that such Proprietary Information and Goodwill have unique value to Company, are not generally known or readily available to Company's competitors, and could only be developed by others after investing significant time and money. Company would not make such Proprietary Information and Goodwill available to Executive unless Company is assured that all such Proprietary Information and Goodwill will be held in trust and confidence by Executive. Executive hereby acknowledges that to use this Proprietary Information and Goodwill except for the benefit of Company would be a breach of such trust and confidence and in violation of Executive's common law duty of loyalty to the Company.

L. **RESTRICTIVE COVENANTS:** Section 7.10 of the Purchase Agreement contains certain non-solicitation obligations and restrictions on competition and competitive employment, which are incorporated herein by reference and which shall apply fully to this agreement.

In recognition of Paragraph K, above, Executive hereby agrees that during the Initial Term of this Agreement, and thereafter as specifically agreed herein:

1. Except in the proper performance of this Agreement, Executive shall at no time directly or indirectly solicit or otherwise encourage or arrange for any employee to terminate employment with Company.

2. Except in the proper performance of this Agreement, Executive shall not directly or indirectly disclose or deliver to any other person or business, any Proprietary Information obtained directly or indirectly by Executive from, or for, Company.

3. Executive agrees that at all times after the termination of this Agreement, Executive shall not seek, solicit, divert, take away, obtain or accept the patronage of any customer or sales prospect of Company through the direct or indirect use of any Proprietary Information of Company, or by any other unfair or unlawful business practice.

4. Executive agrees that for a reasonable time after the termination of this Agreement, which Executive and Company hereby agree to be one (1) year, Executive shall not directly or indirectly, for Executive or for any other person or business, seek, solicit, divert, take away, obtain or accept any customer account or sales prospect with which Executive had direct business involvement on behalf of Company within the one (1) year period prior to termination of this Agreement.

5. Nothing in this Agreement shall be binding upon the parties to the extent it is void or unenforceable for any reason in the State of Employment, including, without limitation, as a result of any law regulating competition or proscribing unlawful business practices.

M. **MODIFICATION OF EMPLOYMENT:** At any time during the Term, a majority of the Board of Directors of Company shall have the absolute right, with or without cause and without terminating this Agreement or Executive's employment hereunder, to modify the nature of Executive's employment for the remainder of the Term to that of a part-time employee ("Modification Period"). The Modification Period shall commence immediately upon Company giving Executive written notice of such change.

1. Upon commencement of the Modification Period: (a) Executive shall immediately resign as an officer and/or director of Company, as applicable, (b) Executive shall promptly return all Company property in Executive's possession to Company, including but not limited to any motor vehicles, equipment, supplies and documents set forth in Paragraph J hereof, and (c) Company shall pay

DOCSSF1:615879.9
3710-20 GH3

INITIALS: EXECUTIVE _____ COMPANY _____

Executive all previously earned and vested but as yet unpaid, salary, prorated bonus or other contingent compensation, reimbursement of business expenses and fringe benefits.

2. During the Modification Period: (a) Company shall continue to pay Executive's monthly salary pursuant to Paragraph F.1 hereof, and provide Executive with the same group health and life insurance to which Executive would otherwise be entitled hereunder, with the understanding and agreement that such monthly salary and group insurance shall constitute the full extent of Company's obligation to compensate Executive, (b) Executive shall not be eligible or entitled to receive or participate in any bonus or fringe benefits other than the aforementioned group insurance, (c) Executive shall be deemed a part-time employee and not a full-time employee of Company, (d) Executive shall provide Company with such occasional executive or managerial services as reasonably requested by the person(s) with the title set forth in Paragraph C hereof, except that failure to render such services by reason of any physical or mental illness or disability other than Total Disability or death as set forth in Paragraph O.2 hereof, shall not affect Executive's right to receive such salary and (e) Company shall pay directly or reimburse Executive in accordance with the provisions of Paragraph G hereof for reasonable business expenses of Company incurred by Executive in connection with such services requested by the person(s) with the title set forth in Paragraph C hereof.

3. The Modification Period shall continue until the earlier of: (a) Total Disability or death as set forth in Paragraph O.2 hereof, (b) termination of this Agreement by Company for "just cause" as hereinafter defined, (c) Executive accepting employment or receiving any other compensation from operating, assisting or otherwise being involved, invested or associated with any business that is similar to or competitive with any business in which Company is engaged on the commencement date of the Modification Period, or (d) expiration of the Term.

N. **SCOPE OF CERTAIN PROVISIONS:** All references to Company in Paragraphs H, J, K, L, O.3 and R in this Agreement shall include Company and its subsidiary corporations and other Company affiliates.

O. **TERMINATION OF EMPLOYMENT:**

1. Company shall have the right to terminate Executive's employment hereunder, at any time during the Term, without notice subject only to a good faith determination by a majority of the Board of Directors of Company of "just cause." "Just cause" includes but is not limited to any (i) theft or other dishonesty, (ii) neglect of or failure to perform employment duties, (iii) inability or unwillingness to perform employment duties, (iv) insubordination, (v) abuse of alcohol or other drugs or substances, (vi) breach of this Agreement; (vii) other misconduct, unethical or unlawful activity, or for (viii) a conviction of or plea of "guilty" or "no contest" to a felony under the laws of the United States or any state thereof. Notwithstanding the foregoing, discharge pursuant to clause (ii), (iii), (iv), (v), (vi) or (vii) shall constitute discharge for just cause only if Executive has first received written notice from the Board of Directors stating with reasonable specificity the nature of such conduct, and, if requested by Executive within ten (10) days thereafter, Executive is afforded a reasonable opportunity to be heard before the Board of Directors; provided, further, that any discharge pursuant to clause (ii), (iii), (iv), (v), (vi) or (vii), shall constitute discharge for just cause only if Executive has failed to remedy or cure such conduct within 30 days after written notice from Company that specifies in reasonable detail the facts and circumstances of conduct so claimed.

2. Employment hereunder shall automatically terminate upon the total disability ("Total Disability") or death of Executive. Total Disability shall be deemed to occur on the nineteenth (90th) consecutive or non-consecutive calendar day within any twelve (12) month period that Executive is unable to perform the duties set forth in Paragraph C hereof because of any physical or mental illness or disability. Company shall pay when due to Executive or, upon death, Executive's designated beneficiary or estate, as applicable, all prorated salary, bonus or other contingent compensation, reimbursement of business expenses and fringe benefits which would have otherwise been

  payable to Executive under this Agreement, through the end of the month in which Total Disability or death occurs.

3. Upon termination of employment hereunder, Executive shall immediately resign as an officer and/or director of Company, as applicable. Executive shall promptly return all Company property in Executive's possession to Company, including but not limited to, any motor vehicles, equipment, supplies and documents set forth in Paragraph J hereof. Company shall pay Executive, when due, all previously earned and vested but as yet unpaid, salary, bonus or other contingent compensation, reimbursement of business expenses and fringe benefits.

4. Notwithstanding the foregoing, upon termination of employment hereunder pursuant to Paragraph O.1 or O.2, Company shall continue to provide Executive and his spouse with the health insurance benefits described in Paragraph F above for the remainder of the Term.

P. **GOVERNING LAW:** This Agreement shall be interpreted and enforced in accordance with the laws of the State of Illinois hereunder.

Q. **ARBITRATION CLAUSE:**

1. Except for the interpretation and enforcement of injunctive relief pursuant to Paragraph R hereof (which shall be subject to litigation in any court having proper jurisdiction), any claim or dispute related to or arising from this Agreement (whether based in contract or tort, in law or equity) including, but not limited to, claims or disputes between Executive and Company or its directors, officers, employees and agents regarding Executive's employment or termination of employment hereunder, or any other business of Company, shall be resolved by a neutral arbitrator agreed upon by both parties, through mandatory, final, binding arbitration in accordance with the procedural and discovery rules of the American Arbitration Association.

2. The cost of such arbitration shall be borne by the Company. Any such arbitration must be requested in writing within one (1) year from the date the party initiating the arbitration knew or should have known about the claim or dispute, or all claims arising from that dispute are forever waived. Any such arbitration (or court proceeding as applicable hereunder) shall be held in Chicago, Illinois or such other location as mutually agreed to by Executive and Company. Judgment upon the award rendered through such arbitration may be entered and enforced in any court having proper jurisdiction.

R. **REMEDIES:** The parties agree that, in the event of a material breach or threatened material breach of Paragraphs K and/or L hereof, the damage or imminent damage to the value of Company's business shall be impractical and/or impossible to estimate or ascertain, and therefore any remedy at law or in damages shall be inadequate. Accordingly, the parties hereto agree that Company shall be entitled to the immediate issuance of a restraining order or an injunction against Executive in the event of such breach or threatened breach, in addition to any other relief available to Company pursuant to this Agreement or under law.

S. **NO WAIVER:** Failure by either party to enforce any term or condition of this Agreement at any time shall not preclude that party from enforcing that provision, or any other provision of this Agreement, at any later time.

T. **SEVERABILITY:** The provisions of this Agreement are severable. If any arbitrator (or court as applicable hereunder) rules that any portion of this Agreement is invalid or unenforceable, the arbitrator's or court's ruling shall not affect the validity and enforceability of other provisions of this Agreement. It is the intent of the parties that if any provision of this Agreement is ruled to be overly broad, the arbitrator or court shall interpret such provision with as much permissible breadth as is allowable under law rather than to consider such provision void.

Sales & Mktg w/ SERP
DOCSSF1:615879.9

INITIALS: EXECUTIVE  COMPANY

U. **SURVIVAL:** All terms and conditions of this Agreement which by reasonable implication are meant to survive the termination of this Agreement, including but not limited to the Restrictive Covenants and Arbitration Clause herein, shall remain in full force and effect after the termination of this Agreement.

V. **CONSTRUCTION:** This Agreement was negotiated in good faith by the parties hereto, who hereby agree to share the responsibility for any ambiguities, uncertainties or inconsistencies herein. Paragraph headings are used herein only for ease of reference, and shall not in any way affect the interpretation or enforcement of this Agreement.

W. **NOTICES:**

1. Any notice required or permitted to be given pursuant to this Agreement shall be in writing and delivered in person, or sent prepaid by certified mail, bonded messenger or overnight express, to the party named at the address set forth below or at such other address as either party may hereafter designate in writing to the other party:

   **Executive:** Michael Sweig
   161 East Chicago Avenue, Condo 60M3
   Chicago, IL 60611

   **Copy:** Vedder, Price, Kaufman & Kammholz
   222 North LaSalle Street, Suite 2400
   Chicago, IL
   Attention: John R. Obiala

   **Company:** ABM Industries Incorporated
   160 Pacific Avenue, Suite 222
   San Francisco, CA 94111
   Attention: Chief Executive Officer

   **Copy:** ABM Industries Incorporated
   160 Pacific Avenue, Suite 222
   San Francisco, CA 94111
   Attention: Chief Employment Counsel

2. Any such Notice shall be assumed to have been received when delivered in person, or forty-eight (48) hours after being sent in the manner specified above.

X. **SPECIAL PROVISIONS:**

1. SALARY: One Hundred Twenty Thousand Dollars ($120,000) per year, effective July 12, 2002 through July 11, 2012, at the monthly rate of $10,000, payable semi-monthly.

2. SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN ("SERP") Following Executive's retirement, resignation and/or termination from employment with Company (but commencing no earlier than what is or would have been Executive's sixty-fifth (65th) birthday and concluding no later than ten (10) years thereafter), Company shall pay to Executive: 120 equal monthly installments each of $1/120^{th}$ of the Supplemental Benefit accrued, pursuant to the terms of the Plan Document, provided herewith.

Y. **ENTIRE AGREEMENT:** Unless otherwise specified herein, this Agreement and Sections 7.9, 7.10 and 7.13 of the Purchase Agreement sets forth every contract, understanding and arrangement as to the employment relationship between Executive and Company, and this Agreement may only be changed by a written amendment signed by both Executive and Company.

Sales & Mktg w/ SERP
DOCSSF1:615879.9

INITIALS: EXECUTIVE _____ COMPANY _____

1. The parties intend that this Agreement speak for itself, and that no evidence with respect to its terms and conditions other than this Agreement itself and Sections 7.9, 7.10 and 7.13 of the Purchase Agreement may be introduced in any arbitration or judicial proceeding to interpret or enforce this Agreement.

2. It is specifically understood and accepted that this Agreement supersedes all oral and written employment agreements, other than Sections 7.9, 7.10 and 7.13 of the Purchase Agreement, between Executive and Company prior to the date hereof, as well as all conflicting provisions of Company's Guidelines for Corporate Approval and its Human Resources Manual, including but not limited to the termination, discipline and discharge provisions contained therein. In the event of a conflict between the terms of this Agreement and Sections 7.9, 7.10 and 7.13 of the Purchase Agreement, the terms of the Purchase Agreement shall prevail.

3. This Agreement may not be amended except in a writing signed by the Executive and two (2) officers of the Company, and approved by the Company's Board of Directors.

4. The rights and obligations of Executive set forth in this Agreement are in addition to and do not supersede the provisions of Sections 7.9, 7.10 and 7.13 of the Purchase Agreement.

**FULL KNOWLEDGE & UNDERSTANDING:** Executive and Company hereby acknowledge that they have carefully read and fully understand all terms and conditions of this Agreement, that they have been given an opportunity to review all aspects of this Agreement with an attorney if they so choose, and that they are voluntarily entering into this Agreement with full knowledge of the benefits and burdens, and the risks and rewards, contained herein.

[Signatures Appear on the Following Page]

IN WITNESS WHEREOF, Executive and two (2) officers of the Company have executed this Agreement as of the date set forth above:

Executive:   Signature: _____

　　　　　　Date: 7/12/02

Company:    ABM Industries Incorporated

　　　　　　Date: 7-12-02
　　　　　　Signature: _____
　　　　　　Title: Pres & CEO
　　　　　　Signature: _____
　　　　　　Title: Gen Counsel, Scty