# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **MICHAEL SWEIG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 08 CV 0271** |
| **v.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **ABM INDUSTRIES, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Michael Sweig ("Sweig"), has filed a two-count action for breach of contract

and quantum meruit against defendant, ABM Industries, Inc. ("ABM").[1]  ABM has moved to

dismiss Sweig's breach of contract and quantum meruit claims pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure.  For the following reasons, ABM's motion [#6] will be denied.

## I.      Motion to Dismiss Standard

A motion to dismiss under Rule 12(b)(6) challenges the complaint for failure to state a

claim upon which relief may be granted.  *General Elec. Capital Corp.* v. *Lease Resolution Corp.*,

128 F.3d 1074, 1080 (7th Cir. 1997).  In ruling on a motion to dismiss, the court accepts as true

all well-pleaded facts alleged in the complaint and draws reasonable inferences from those facts

in the plaintiff's favor.  *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002).  In order to survive a

motion under Rule 12(b)(6), the Seventh Circuit has found that the complaint must provide the

---

[1]  Sweig's complaint was initially filed in the Circuit Court of Cook County, Illinois and was properly removed by ABM to the district court on January 18, 2008.  This court has jurisdiction over this matter under 28 U.S.C. 1332(a), as the matter in controversy amounts to $3.65 million (exceeding the requisite $75,000) and is between an Illinois citizen (Sweig) and a corporation that is a citizen of Delaware and California (ABM).

defendant with "fair notice of what the . . . claim is and the grounds upon which it rests."

*EEOC* v. *Concentra Health Servs., Inc.*, 496 F.3d 773, 776-77 (7th Cir. 2007) (citing *Bell Atl.*

*Corp.* v. *Twombly*, --- U.S. ---, 127 S. Ct. 1955, 1964, 167 L.E.2d 929 (2007)).  The allegations

in the complaint must also be "enough to raise a right to relief above a speculative level."

*Twombly*, 127 S. Ct. at 1965.

## II.    Facts[2]

Sweig is the former chairman and CEO of Lakeside Building and Maintenance and

Lakeside Michigan, companies that provided janitorial and facility maintenance services for

large-scale facilities.  On or about July 12, 2002, ABM acquired substantially all of the assets,

business, and goodwill of Sweig's companies, and also entered into a Sales and Marketing

Employment Agreement (the "Employment Agreement").  Under the Employment Agreement,

Sweig was to perform marketing and sales duties such as maintaining and generating new

customer accounts, preserving and building new and existing business relationships, and

occasionally carrying out tasks as assigned by ABM's CEO, Henrik C. Slipsager ("Slipsager").

Sweig alleges in his complaint that the "[a]cquisition of companies is a matter unrelated to [his]

duties and responsibilities under the [Employment Agreement]."  Compl. ¶ 9.

Sweig's claims arise from the prelude to ABM's acquisition of the company, OneSource.

In or about the summer of 2005, Slipsager and Sweig had a discussion about the possibility of

ABM's acquiring other companies, wherein Sweig recommended OneSource as a potential

target.  Sweig had a long-standing relationship with the Chairman of OneSource, Lord Michael

Ashcroft ("Lord Ashcroft"), and offered to introduce Slipsager to him.  During this conversation,

---

[2]  Unless otherwise stated, the facts recited here are taken from Sweig's complaint.

he explained to Slipsager that he expected to be compensated if the relationship ultimately resulted in an acquisition.  In 2006 and 2007, Slipsager and Sweig again discussed a possible business relationship between the two companies.  In or about spring 2007, Slipsager asked Sweig to approach Lord Ashcroft about the possible deal, and Sweig and Slipsager agreed orally at that time that Sweig would be compensated if the deal went through.  Sweig then contacted Lord Ashcroft to discuss the possible acquisition.  Sweig again told Slipsager that he expected to be compensated if a deal resulted.  Slipsager did not disagree.  Sweig then reported the information regarding his meeting with Ashcroft to Slipsager, after which Slipsager and Lord Ashcroft discussed the potential acquisition.  Following Slipsager and Lord Ashcroft's discussion, Slipsager "assured Sweig that he would receive a one percent (1%) business opportunity fee if the deal closed."  Compl. ¶ 17.  ABM officially acquired OneSource on October 7, 2007 for $365 million.  According to press releases issued by ABM, the company expected to receive "$28 million to $32 million worth of cost synergies" and would realize $14 million in tax cost savings due to the merger.  Compl. ¶ 20.

Following the acquisition of OneSource, ABM refused to compensate Sweig in the form of a business opportunity fee, despite their oral agreement, and the present suit ensued.

## III.    Discussion

ABM has moved to dismiss Sweig's breach of contract claim on the grounds that (1) the oral agreement ("Oral Agreement") to compensate Sweig for his assistance with the OneSource acquisition was covered by the Employment Agreement and, as such, it qualified only as a modification of that contract, which was void under its integration clause; (2) the Oral

3

Agreement is not an enforceable contract because of its indefinite price term; and (3) the Illinois

Business Brokers Act, 815 Ill. Comp. Stat. 307/10-1 to 307/99-1, bars Sweig's claims.

A.    **Argument that Oral Agreement Is Covered by Employment Agreement**

ABM has attached the Employment Agreement entered into by ABM and Sweig to its

motion to dismiss.  The Employment Agreement is properly considered part of the complaint

since Sweig refers to it in his pleading, and it is integral to providing the context for the Oral

Agreement.  *See Wright* v. *Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (citing

*Venture Assocs. Corp.* v. *Zenith Data Sys. Corp.*, 987 F.2d 431 (7th Cir. 1993)).   Further, if

Sweig's allegations in his complaint conflict with the terms of the Employment Agreement, the

court does not have to accept those allegations as true.  *Jackson Nat'l Life Ins. Co.* v. *Gofen &*

*Glossberg, Inc.*, 882 F. Supp. 713, 718 (N.D. Ill. 1995) (citing *Graue Mill Dev. Corp.* v.

*Colonial Bank & Trust Co.*, 927 F.2d 988, 991 (7th Cir. 1991) (finding that the terms of a written

contract will prevail over the pleadings)).

In its motion to dismiss, ABM first argues that the Oral Agreement between ABM and

Sweig was covered by the parties' Employment Agreement.  ABM specifically notes that the

Employment Agreement stipulates in the "Duties and Responsibilities" clause (the "Duties

Clause") that Sweig "shall be expected to assume and perform such sales and marketing duties

and responsibilities as are assigned from time to time by the Chief Executive Officer of the

Company to whom [Sweig] shall report and be accountable," and that his sales and marketing

duties were to include "without limitation . . . preservation and building of new and existing

business relationships of [ABM] and its affiliates."  Def.'s Mot. to Dismiss, Ex. 1, at § C.  This

text, ABM contends, indicates that Sweig's interaction with Lord Ashcroft occurred at the

direction of Slipsager (and thus was within the terms of the Employment Agreement) and also qualified as building a new business relationship for the company. ABM urges the court to look at the document alone to determine what is meant by "building new business relationships." *See Air Safety, Inc.* v. *Teachers Realty Corp.*, 706 N.E.2d 882, 884, 185 Ill.2d 457, 236 Ill. Dec. 8 (1999) (noting that Illinois contracts are interpreted according to the "four corners" rule). ABM further argues that the unambiguous language of the document requires that the court dismiss this claim as a matter of law. *See id.* at 884. Specifically, ABM argues that "the plain language of the Employment Agreement establishes that it broadly governs the entire employment relationship between Plaintiff and ABM. The Employment Agreement provides for the building of new business relationships, such as the acquisition of OneSource, as assigned by ABM." Def.'s Mot. Memo. at 7. Sweig concedes in his complaint that he and Slipsager discussed a possible "business relationship" between ABM and OneSource. Compl. ¶ 11. The question then becomes, whether in brokering an acquisition of OneSource for ABM, Sweig was simply acting within his sales and marketing duties by "building a new business relationship," or whether "building new business relationships" does not include assisting in the acquisition of other companies. If the latter, then Sweig's actions were not within the scope of his Employment Agreement.

Determining whether a contract is ambiguous is a matter of law. *Bourke* v. *Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998). Mere disagreement about the meaning of a term will not render a contract ambiguous. *Interim Health Care of N. Ill., Inc.* v. *Interim Health Care Inc.*, 225 F.3d 876, 879 (7th Cir. 2000). Neither party in the case at hand explicitly argues that the Employment Agreement is ambiguous, but both nonetheless interpret the

language differently.  Because the language has been interpreted as having two different
meanings, the court must decide whether both interpretations are reasonable in order to
determine whether it is ambiguous.  *Bourke*, 159 F.3d at 1037.

 In a recent Illinois case, the court found that "a clause promising to 'proceed in good
faith . . . to build up diligently and extend the business of marketing of [defendant's invention] as
rapidly and fully as practicable' is quite ambiguous."  *Marusiak* v. *Adjustable Clamp Co*.,
No 01 C 6181, 2005 WL 2420370, at *6 (N.D. Ill Sept. 30, 2005).  The court further noted that
this clause was "susceptible to several different constructions," explaining that "[s]uch a clause
could mean anything from a promise to engage in some degree of marketing efforts to a covenant
to undertake a much more extensive marketing campaign." *Id*.  Similarly, in the instant case, the
obligation to "build new business relationships" could range from bolstering ABM's
relationships with new customer accounts, as Sweig contends in his response, Pl.'s Resp. at 6, to
acquiring for ABM the assets of other businesses.  It is not clear from the terms of the contract
alone, though, that "building new business relationships" encompasses the act of acquiring (or,
likewise, brokering the acquisition of) other businesses.  In fact, other portions of the contract
indicate that the Duties Clause might not have such a broad meaning.  *See Mastrobuono* v.
*Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63, 115 S. Ct. 1212, 131 L. Ed. 2d 76 (1995)
(noting that "a document should be read to give effect to all its provisions and to render them
consistent with each other").  Specifically, the fact that the Employment Agreement places
emphasis on making customer data available to Sweig may evidence that his role was to be
customer-centric.  *See* Def.'s Mot., Ex. 1, at § K(1).  Additionally, the fact that the
"Compensation" section of the Employment Agreement provides for a salary adjustment in the

event of another "employment agreement, in addition to [this contract], with [ABM]" raises the possibility that the parties anticipated entering into other, separate employment agreements. Def.'s Mot. to Dismiss, Ex. 1, at § F(2)(a). Because both interpretations of the Duties Clause seem reasonable, dismissal at this stage would be inappropriate.[3]

In its motion to dismiss, ABM in large part relies on *Air Safety, Inc.* v. *Teachers Realty Corp.*, 706 N.E.2d 882, 185 Ill. 2d 457, 236 Ill. Dec. 8 (Ill. 1999). In *Air Safety*, the parties contested the meaning of a contract dealing with asbestos abatement. *Id*. at 459–60. In that case, three change orders were made to amend the prior contract governing the asbestos abatement project. *Id*. at 460–61. The moving party argued that an integration and merger clause negated the change orders. *Id*. It is not clear, however, that *Air Safety* is applicable here. While in *Air Safety* it was uncontroverted that the subsequent agreements were modifications of the initial agreement, in the instant case it is not clear that the subsequent oral agreement between Sweig and ABM resulted in a modification of the Employment Agreement. Moreover, the court's decision in *Air Safety* came at the summary judgment stage, after additional evidence had been made available through discovery.

Furthermore, the issue before the court in *Air Safety* was whether to allow a "provisional admission" of extrinsic ambiguities. *Id*. at 463. A "provisional admission" would allow a party to provide parol evidence to show that an otherwise unambiguous contract in fact *is* ambiguous by looking outside of the language of the contract. *Id*. The court in *Air Safety* declined to rule on the use of the provisional admission approach, which has been applied in many cases by the

---

[3] The court notes that information available at a later stage in the litigation about ABM and Sweig's employment history may shed light on the meaning of "building new business relationships." *See Murphy* v. *Keystone Steel & Wire Co., a Div. of Keystone Consol. Indus., Inc.*, 61 F.3d 560, 564–65 (7th Cir. 1995) (stating that "[s]ummary judgment is particularly appropriate in cases involving the interpretation of contracts") (citing *Ryan* v. *Chromalloy Am. Corp.*, 877 F.2d 598, 602 (7th Cir. 1989)).

Illinois appellate court. *Id*. Importantly, the challenge in that case was not that the terms were "facially unambiguous," but rather whether extrinsic evidence should have been used to determine their meaning. *Id*. at 463–64. Here, however, the court is not attempting to decide whether to allow for a "provisional admission" to determine the meaning of "building of new business relationships" but, rather, is deciding whether that language is, on its face, susceptible to two reasonable interpretations. The court decides that it is.

**B.     Modification of Employment Agreement or a New Contract**

ABM further argues that the subsequent Oral Agreement is void as a matter of law because it modified ABM's employment relationship with Sweig, and the Employment Agreement required such a modification to be in writing and entered into by two officers. ABM contends that the Employment Agreement's integration clause is fatal to Sweig's claim because it specifically laid out guidelines for subsequent modifications. Sweig, on the other hand, alleges in its complaint that the Oral Agreement was a separate contract altogether, and thus not governed by the integration clause, and only addresses the possibility of a modification in its response to ABM's motion to dismiss. If the Oral Agreement is, in fact, a contract modification rather than a new contract, ABM's argument that it fails due to the integration clause may have some merit. *See, e.g.*, *Leavitt* v. *John Hancock Life Ins. Co.*, No. 04 C 7451, 2007 WL 625636, at *8 (N.D. Ill. Feb. 23, 2007) (finding that a subsequent oral modification was void because it was not entered into by a party with authority to bind). *But see Tadros* v. *Kuzmak*, 660 N.E.2d 162, 170, 277 Ill. App. 2d 301, 213 Ill. Dec. 905 (1995) (noting that Illinois courts have found written contracts to be modifiable by subsequent oral agreements even though the language of the contract precludes them). The court need not enter into an inquiry as to whether this was a

8

valid modification of the Employment Agreement, however, since it is not evident at this point whether the Oral Agreement was a modification at all.  Rather, it may be that the Oral Agreement constituted a separate contract.

ABM points to the Employment Agreement's integration clause as defeating Sweig's argument, broadly asserting that "[t]he parties expressly agreed that their contractual relationship must be reduced to writing, signed by Plaintiff and two officers and have ABM's board approval to have effect."  Def.'s Mot. Mem. at 7.  The actual language of the Employment Agreement, however, provides that "this Agreement . . . sets forth every contract, understanding and arrangement *as to the employment relationship* between [Sweig] and [ABM], and *this Agreement* may only be changed by written amendment signed by both [Sweig] and [ABM]."  Def.'s Mot., Ex. 1, at § Y (emphasis added).  It is important to note that Sweig alleges in his complaint not that the Oral Agreement was a contract modification but, rather, that it was a separate contract altogether.  ABM incorrectly characterizes Sweig's argument when it asserts that "Plaintiff argues that he should be relieved from his explicit obligation to amend the agreement in writing only, but he offers no explanation why he should be excused from the requirement that any valid modification must be agreed to by two officers."  Def.'s Reply at 9 (emphasis omitted).  Again, such an assertion assumes that the Agreement was a modification, as opposed to a separate contract.

The Seventh Circuit, applying Illinois law, has explained that "[a] modification of a contract is a change in one or more respects which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed."  *Int'l Bus. Lists, Inc.* v. *Am. Tel. & Tel. Co.*, 147 F.3d 636, 641 (7th Cir. 1998).  It is not clear that the Oral

Agreement between ABM and Sweig altered the terms of the Employment Agreement; rather, it appears at this stage that the alleged oral contract to broker an acquisition in exchange for a finder's fee could be deemed a distinct contract.  *See, e.g.*, *ECHO, Inc.* v. *Whitson Co., Inc.*, 52 F.3d 702, 708 (7th Cir. 1995) (finding that a distributorship agreement and a purchase order pursuant to that agreement were separate contracts); *Aon Corp.* v. *Utley*, 863 N.E.2d 701, 706, 371 Ill. App. 3d 562, 309 Ill. Dec. 69 (Ill. App. Ct. 1st Dist. 2006) (finding that two agreements between the parties were distinct contracts because the latter did not "pertain to the same subject matter" as the earlier contract).

Furthermore, the Oral Agreement introduces an entirely different compensation scheme than was in place for Sweig and ABM's employment relationship under the Employment Agreement.  Also important is that brokers and finders may be considered an entirely separate professional category, with regulatory schemes addressing them and specific contractual duties and customs.  *See, e.g.*, *Black's Law Dictionary* 205 (8th ed. 2004) (defining a "broker" as "[a]n agent who acts as an intermediary or negotiator, esp. between prospective buyers and sellers"); *id.* at 664 (8th ed. 2004) (defining a "finder" as "[a]n intermediary who brings together parties for a business opportunity, such as two companies for a merger"); *see also* Illinois Business Broker's Act, 815 Ill. Comp. Stat. 307/10-1 to 307/99-1 (see further discussion of this statute below).  In this case, for example, the court cannot be sure that Slipsager and Sweig would not have had the same conversations regarding an acquisition of OneSource regardless of whether Sweig was an employee of ABM or not.  Indeed, Sweig may simply have leveraged a personal connection in exchange for compensation.

Thus, because it is not clear that brokering the acquisition of businesses such as OneSource was within the scope of Sweig's Employment Contract, ABM's motion to dismiss cannot be granted on that basis.

### C.    Indefiniteness Argument

ABM next moves to dismiss Sweig's breach of contract claim on the grounds that the alleged oral agreement fails for indefiniteness. Specifically, ABM argues that the agreement lacked an essential term: price. Under Illinois law, price is generally considered an essential contract term. *Ne. Ill. Reg'l Commuter R.R. Corp.* v. *Kiewit W. Co.*, 396 F. Supp. 2d 913, 921 (N.D. Ill. 2005). For an oral contract to be binding, the material terms of the agreement have to be definite enough for the court to determine the intention of the parties. *Id.* Courts have found, however, that something other than a strictly fixed price may suffice. *See Kellner* v. *Bartman*, 620 N.E.2d 607, 611, 250 Ill. App. 3d 1030, 189 Ill. Dec. 639 (Ill. App. Ct. 4th Dist. 1993) (noting that providing a mode for determining a price can be definite enough); *see also* 17A Am. Jur. 2d Contracts § 182 (noting that courts are "reluctant to hold that a contract is too uncertain to be enforceable" and that "a determination that an agreement is sufficiently definite is favored in the courts, so as to carry out the reasonable intention of the parties if it can be ascertained").

In the *Kiewit* case, on which both parties rely, the court found that an oral agreement to pay for repair work was too ambiguous with respect to price. 396 F. Supp. 2d at 921. Specifically, the party refusing to pay for the repairs had only agreed to a proposed price as "seem[ing] pretty reasonable" and had instructed the other party to "spare no expense." *Id.* ABM argues that the conversations between Sweig and Slipsager about a "customary fee" and payment of a one percent (1%) business opportunity fee constitute a similarly vague agreement.

In *Kiewit*, however, the court did not mention the specific price that the party deemed "pretty reasonable." *See id*. Here, in contrast, the court must accept plaintiff's allegation that the agreed upon (and ascertainable) amount was one percent of the sale price.[4]

Additionally, customary rates have been found to be sufficiently definite substitutes for an unknown price term when there is a common trade practice. *See Bensdorf & Johnson, Inc.* v. *N. Telecom Ltd*., 58 F. Supp. 2d 874, 878 (N.D. Ill. 1999) (noting that the implicit reasonable price term is "particularly true for brokerage contracts"); *see also Miller* v. *Bloomberg*, 324 N.E.2d 207, 207, 26 Ill. App. 3d 18 (Ill. App. Ct. 2d Dist. 1975) (stating that "where a contract specifies that the price is to be measured by the 'fair market value', 'reasonable value' or 'current market value'. . . courts have generally held that the price is sufficiently certain in order to have an enforceable obligation").

In sum, construing the allegations in the complaint in favor of Sweig, there appears to be a plausible claim that the two parties had an oral agreement regarding the definite amount of compensation.

### D.    Illinois Business Brokers Act

ABM further argues that the Illinois Business Brokers Act ("the Act"), 815 Ill. Comp. Stat. 307/10-1 to 307/99-1, bars Sweig's claims for breach of contract. ABM contends that, because Sweig was the procuring cause of ABM's acquisition of OneSource, he qualifies as a business broker under the Act. The Act seeks to regulate middlemen in business transactions. Edwin D. Mason & Charles R. Haywood, *The Illinois Business Brokers Act:  Pitfalls for the Unwary*, 85 Ill. B.J. 542, 542 (1997). However, the Act does not apply to the transaction at hand

---

[4]  It is also worth noting that *Kiewit*, 396 F. Supp. 2d at 920–21, was decided at the summary judgment stage, presumably providing the court with more information about the specifics of the agreement.

because the parties do not meet one of the statutory requirements.  Section 105 of the Act

provides that it "shall apply only when the person engaging or seeking to engage the business

broker is domiciled in this State or when the company or business sought to be sold has its

principal place of business in this State."  815 Ill. Comp. Stat. 307/10-105.  For purposes of the

Act, ABM, the entity engaging the business broker, is considered domiciled in California, where

it has its principal place of business, and Delaware, its place of incorporation.  Ill. Admin. Code

tit. 14, §140.51(a) ("Domicile," for purposes of the Act "means, when applied to a business, that

entity's principal place of business and, where applicable, that entity's place of incorporation.");

*see also Sandra F. Monroe & Co., Inc.* v. *Nat'l Equip. Servs., Inc.*, No. 99 C 3120, 2000 WL

420746, at *3–4 (N.D. Ill. Apr. 12, 2000) (finding that because the Act is a "consumer protection

statute" the term "domiciled" should be construed broadly to include *both* the "place of

incorporation" *and* "principal place of business.") (emphasis added).  Additionally, although

neither party has indicated where OneSource's principal place of business is located, neither has

alleged or otherwise suggested that it is located in Illinois.  As such, the law does not apply to

this transaction.

ABM cites dicta, most notably from *Sandra F. Monroe* v. *National Equipment Services*,

2000 WL 420746, at *3, suggesting that "domicile" could have a broader meaning under the Act

and argues that ABM's "deep connection with Illinois and its reliance upon the protections

afforded by Illinois law" provide a basis for applying the Act in this case.  *See* Def.'s Mot. at 12.

But the court finds no basis, either in *Sandra F. Monroe* or elsewhere, for stretching the

definition of "domicile" to the great lengths that Sweig suggests.

Additionally, ABM argues that because the applicable substantive law is Illinois state law, the Act should necessarily apply.  It is true that Illinois state law is governing because Sweig has brought this action in Illinois, the Employment Agreement contains an Illinois choice of law provision, and neither party contests the application of Illinois law.  *See Wood* v. *Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) (stating that "when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits").  However, the text of the Act contains explicit requirements for its applicability, and the parties to this suit do not qualify.  Thus, in the absence of evidence that the transaction at issue meets the statutory requirements of the Act, it would be improper to dismiss based on this ground.

### E.      Quantum Meruit Claim

ABM does not devote much of its briefing to Sweig's second count, an alternative claim for quantum meruit, but nonetheless argues for its dismissal as well.  Sweig is permitted to plead alternative claims of breach of contract and quantum meruit.  *See Bus. Dev. Servs.*, *Inc.* v. *Field Container Corp.*, 422 N.E.2d 86, 94, 96 Ill. App. 3d 834, 52 Ill. Dec. 405 (Ill. App. Ct. 1st Dist. 1981); *see also* Fed. R. Civ. P. 8(d)(2)–(3) (allowing alternative pleadings alleging different theories in a complaint, regardless of consistency).

In order to address the quantum meruit claim, it is again necessary to examine the scope of the Employment Agreement.  As the Seventh Circuit has explained, "When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract."  *Utility Audit, Inc.* v. *Horace Mann Serv. Corp*, 383 F.3d 683, 688–89 (7th Cir. 2004) (citing *Cromeens, Holloman, Sibert, Inc.* v. *AB Volvo*, 349 F.3d 376, 397

14

(7th Cir. 2003)).  While Sweig and ABM's employment relationship was governed by the

Employment Agreement, it is not clear that the claimed compensation falls within that contract.

*Cf. Allied Vision Group, Inc.* v. *RLI Prof'l Techs., Inc.*, 916 F. Supp. 778, 781 (N.D. Ill. 1996)

(finding that an unjust enrichment claim was barred because the plaintiff's right to a finder's fee

was explicitly included in the underlying contract).  As discussed above, whether Sweig's efforts

in brokering a deal between ABM and OneSource fell within the scope of the Employment

Agreement is unclear.  It is likewise not clear that the Employment Agreement necessarily

governs the parties' relationship with respect to Sweig's quantum meruit claim.

        In order to state a claim under the doctrine of quantum meruit, the plaintiff must (in

addition to showing that the claim is outside of the scope of a pre-existing contract) show (1) that

the plaintiff performed services; (2) the reasonable value of those services; and (3) that the

services provided a benefit to the defendant which would be unjust for him to keep without

paying the plaintiff.  *Bensdorf & Johnson, Inc.* v. *N. Telecom Ltd.*, 58 F. Supp. 2d 874, 880 (N.D.

Ill. 1999).  In this case, ABM undoubtedly realized a benefit from the acquisition of OneSource,

as evidenced in ABM's press release following the acquisition.  Compl. ¶20 (noting that the

acquisition resulted in $28–32 million in cost synergies and a total of about $14 million dollars

in tax savings).  The parties are also in agreement that Sweig was the procuring cause of the

transaction.  *See Mirza* v. *Fleet Retail Fin., Inc.*, No. 01 C 0566, 2002 WL 31526549, at *3 (N.D.

Ill. Nov. 13, 2002) (finding that, "[u]nder Illinois law, in order to earn a commission, a business

opportunity broker or finder must be the procuring cause of the transaction"); *Edens View Realty*

*& Inv., Inc.,* v. *Heritage Enters., Inc.*, 408 N.E.2d 1069, 1074, 87 Ill. App. 3d 480, 42 Ill. Dec.

360 (Ill. App. Ct. 1st Dist. 1980) (holding that "plaintiff was instrumental in bringing the buyer

and seller together and was thus the procuring cause of the sale of defendant's property"). Furthermore, brokers have been found to be entitled to reasonable commissions. *See, e.g. Weisberg* v. *Century Int'l Foods, Inc.*, No. 88 C 10154, 1990 WL 115598, at *3 (N.D. Ill. Aug. 7, 1990) (finding that a "triable issue of fact" existed as to "whether a right to a commission existed"). Thus, because Sweig provided a benefit to ABM through his introduction to Lord Ashcroft and may have a right to a commission, he has sufficiently stated a claim for quantum meruit in the amount of a 1% business opportunity fee. *See Mirza*, 2002 WL 31526549, at *5 (declining to rule on the validity of a 0.5% finder's fee for purposes of quantum meruit at the summary judgment stage, and, instead, allowing the plaintiff to argue "the value of his services at trial").

**IV.      Conclusion and Order**

For the foregoing reasons, ABM's motion to dismiss Sweig's breach of contract and quantum meruit claims [#6] is denied.

Dated:  June 20, 2008                                Enter: *Joan H. Lefkow*
                                                            _____
                                                            JOAN HUMPHREY LEFKOW
                                                            United States District Judge