**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL SWEIG, | ) |
| | ) |
| Plaintiff, | ) Case No. 08-cv-271 |
| | ) |
| v. | ) Judge Lefkow |
| | ) |
| ABM INDUSTRIES INCORPORATED, | ) Magistrate Judge Mason |
| | ) |
| Defendant. | ) |

## ANSWER AND AFFIRMATIVE DEFENSES

Defendant, ABM INDUSTRIES, INC. ("ABM"), by its attorneys, Jennifer A. Kenedy

and Simon Fleischman, for its Answer and Affirmative Defenses to Plaintiff's Complaint, states

as follows:

## THE PARTIES

1.      Sweig is the former Chairman and Chief Executive Officer of Lakeside Building
Maintenance, Inc. ("Lakeside"), and the former Chief Executive of Lakeside Building
Maintenance of Michigan ("Lakeside Michigan").  Prior to July 2002, Lakeside and Lakeside
Michigan provided janitorial and facility maintenance services to commercial, industrial,
institutional and retail facilities.

**Answer:**      Admitted upon information and belief.

2.      ABM provides janitorial, parking, engineering, security, lighting and mechanical
services for thousands of commercial, industrial, institutional and retail facilities.  ABM has
offices, employees and does business in Illinois.  ABM is one of the largest facility services
contractors listed on the New York Stock Exchange, with fiscal 2006 revenues in excess of $2.7
billion and more than 75,000 employees.

**Answer:**      Admitted.

## JURISDICTION AND VENUE

3.      This Court has personal jurisdiction over ABM, as ABM has, by its conduct,
submitted itself to the jurisdiction of the courts of this State pursuant to 735 ILCS 5/2-209(a)(1)
by transacting business within this State; pursuant to 735 ILCS 5/2-209(a)(7) by the making of a
contract or promise substantially connected with this State; and/or pursuant to 735 ILCS
5/2209(b)(4) by doing business within this State.

**Answer:**        Denied.  The United States District Court for the Northern District of

Illinois has jurisdiction over the subject matter and the parties in this case.

4.        Venue is proper in this Court pursuant to 735 ILCS 5/2-101 because the transaction or some part thereof occurred in Cook County.

**Answer:**        Denied.  The United States District Court for the Northern District of

Illinois is the proper venue.

## FACTS COMMON TO ALL CLAIMS

5.        Prior to July 12, 2002, Lakeside and Lakeside Michigan provided janitorial and related services in the Midwest.

**Answer:**        Admitted upon information and belief.

6.        On or about July 12, 2002, ABM acquired substantially all the assets, business and goodwill of both Lakeside and Lakeside Michigan, pursuant to an Asset Purchase Agreement, dated July 12, 2002, among ABM, Lakeside, Lakeside Michigan and other parties.

**Answer:**        ABM generally admits the allegations in Paragraph 6 but notes that the

referenced Asset Purchase Agreement was dated as of July 10, 2002.

7.        Following ABM's acquisition of Lakeside and Lakeside Michigan, Sweig entered into a Sales and Marketing Employment Agreement, dated July 12, 2002 (the "Sales and Marketing Agreement"), with ABM.

**Answer:**        Admitted.

8.        Under the Sales and Marketing Agreement, Sweig's duties and responsibilities involved sales and marketing activities directed to customers to whom Lakeside and Lakeside Michigan had provided janitorial and building maintenance services prior to the ABM acquisition, the preservation of business relations with existing ABM janitorial and building maintenance customers and generation of new customer accounts for ABM's janitorial and facility services industry.

**Answer:**        ABM admits that Plaintiff's duties and responsibilities under the Sales and

Marketing Agreement include, among others, those identified in Paragraph 8; however, ABM

denies that Plaintiff's duties and responsibilities are limited to those alleged in Paragraph 8.

ABM affirmatively states that Plaintiff's duties and responsibilities under the Sales and

CHI1 1503561v.5

Marketing Agreement also include, under Section C, "new business relationships" such as the acquisition of OneSource described in the Complaint.

9.     In or about the summer of 2005, Henrik C. Slipsager ("Slipsager"), ABM's President and Chief Executive Officer, spoke with Sweig regarding strategic growth of ABM through the acquisition of companies that provided services similar or complementary to ABM's. Acquisition of companies is a matter unrelated to Sweig's duties and responsibilities under the Sales and Marketing Agreement.

**Answer:**     ABM denies that Slipsager solicited advice from Plaintiff at any time

regarding the strategic growth of ABM, and affirmatively states that in the summer of 2005 there

was much discussion among persons interested in the commercial janitorial services industry

regarding consolidation in the industry generally.  ABM further denies that tasks assigned by

Slipsager for the purpose of building new business relationships, through acquisitions or

otherwise, are unrelated to Plaintiff's employment responsibilities under the Sales and Marketing

Agreement.

10.     During their discussions in or about the summer of 2005, Sweig recommended OneSource as a potential target for ABM. Slipsager knew that Sweig had a long-standing business relationship with OneSource's Chairman and majority stockholder, Lord Michael Ashcroft ("Lord Ashcroft") and could make the introduction and explore a possible affiliation between ABM and OneSource. Sweig informed Slipsager that he would make the introduction but expected to be compensated if an acquisition resulted.  Slipsager did not request Sweig to contact Lord Ashcroft on behalf of ABM at that time, but said he would keep Sweig's offer in mind.

**Answer:**     ABM denies that Slipsager solicited advice from Plaintiff at any time

regarding the strategic growth of ABM, and further denies that Plaintiff played any role in

initially identifying OneSource as a potential acquisition target for ABM.  ABM affirmatively

states that there was a great deal of talk among persons interested in the commercial janitorial

services industry at that time regarding consolidation in the industry generally, including without

limitation, a potential new business relationship between ABM and OneSource.  Any comment

from Plaintiff on that topic would have been nothing more than Plaintiff repeating what others

CHI1 1503561v.5

were discussing at the time.  ABM further affirmatively states that Slipsager is a former president

of OneSource and was already well aware of the potential benefits of a new business relationship

between ABM and OneSource, and had several possible avenues of communication into

OneSource.  ABM admits that Slipsager was aware of Plaintiff's acquaintance with Lord

Ashcroft, but denies, upon information and belief, that Plaintiff had a long-standing relationship

with Lord Ashcroft.  ABM admits Plaintiff's allegation that Slipsager did not request Plaintiff to

contact Lord Ashcroft on behalf of ABM.  ABM denies that Plaintiff ever stated that he expected

compensation if ABM acquired OneSource and denies the remaining allegations in Paragraph

10.

        11.     In the spring of 2006, Slipsager and Sweig again discussed a possible business
relationship between ABM and OneSource and again discussed Sweig's close relationship with
Lord Ashcroft.  Slipsager did not ask Sweig to contact Lord Ashcroft on behalf of ABM at that
time.

        **Answer:**        ABM admits Plaintiff mentioned a possible new business relationship

between ABM and OneSource in the spring of 2006.  ABM affirmatively states that there was a

great deal of talk among persons interested in the commercial janitorial services industry at that

time regarding consolidation in the industry generally, including without limitation, a potential

new business relationship between ABM and OneSource.  Any comment from Plaintiff on that

topic would have been nothing more than Plaintiff repeating what others were discussing at the

time.  ABM further affirmatively states that Slipsager is a former president of OneSource and

was already well aware of the potential benefits of a new business relationship between ABM

and OneSource, and had several possible avenues of communication into OneSource.  ABM

admits the allegation that Slipsager did not ask Plaintiff to contact Lord Ashcroft on behalf of

ABM at that time.  Upon information and belief, ABM denies that Plaintiff had or has a close

relationship with Lord Ashcroft.  ABM denies the remaining allegations in Paragraph 11.

12.    In or about the spring of 2007, Slipsager contacted Sweig and asked Sweig to approach Lord Ashcroft to see if he had an interest in a potential affiliation between One Source and ABM. Sweig again informed Slipsager that he would do so, but that he expected a fee if any deal was consummated.  Slipsager orally agreed that Sweig would be compensated if a deal between ABM and OneSource closed.

**Answer:**    ABM denies that Slipsager asked Sweig to contact Lord Ashcroft regarding a potential new business relationship between ABM and OneSource, and affirmatively states that Plaintiff volunteered to call Lord Ashcroft.  ABM denies that Sweig requested a fee for contacting Lord Ashcroft and denies that Slipsager agreed that Sweig would be compensated if a deal between ABM and OneSource closed.  On the contrary, Plaintiff admitted in an e-mail to Slipsager dated June 14, 2007 that he viewed working on acquisitions as "part of [his] job at ABM."

13.    In reliance on this oral promise, in or about the spring of 2007, Sweig telephoned Lord Ashcroft from Chicago and informed him of ABM's interest in acquiring OneSource. Lord Ashcroft told Sweig that he was interested in such a transaction.  Lord Ashcroft requested that Sweig inform Slipsager of OneSource's interest and asked Slipsager to contact Lord Ashcroft to further discuss ABM's potential acquisition of OneSource.

**Answer:**    ABM denies that Slipsager made any oral promise to Plaintiff at any time regarding compensation for contacting Lord Ashcroft.  ABM lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 13.

14.    Prior to providing Slipsager with information regarding his discussion with Lord Ashcroft, Sweig again reminded Slipsager that, if ABM acquired OneSource, Sweig would expect to be compensated for his role in bringing the parties together. Slipsager did not dispute Sweig's request for compensation and accepted all information regarding Sweig's conversations with Lord Ashcroft.  As a result, Sweig anticipated that, if the ABM/OneSource transaction was consummated, he would be paid by ABM for his efforts.

**Answer:**    ABM denies that Plaintiff ever requested, reminded, or otherwise indicated to Slipsager that he "would expect to be compensated" for calling Lord Ashcroft to arrange a subsequent call between Slipsager and Lord Ashcroft.  ABM affirmatively states that Plaintiff admitted in an e-mail to Slipsager dated June 14, 2007 that he viewed working on

5

acquisitions as "part of [his] job at ABM." ABM lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 14.

15.     Sweig informed Slipsager about his discussions with Lord Ashcroft and
OneSource's interest in being acquired by ABM. Sweig provided Slipsager with Lord
Ashcroft's telephone number and other contact information. Sweig told Slipsager that he should
contact Lord Ashcroft directly, as requested by Lord Ashcroft.

**Answer:**     ABM denies, upon information and belief, that Plaintiff had "discussions

with Lord Ashcroft and OneSource's interest in being acquired by ABM," and further denies that

Slipsager required Plaintiff to provide any contact information for Lord Ashcroft because that

information was readily available to ABM from a variety of sources. ABM affirmatively states

that Slipsager is a former president of OneSource and had several possible avenues of

communication into OneSource.

16.     Upon information and belief, Slipsager had never met Lord Ashcroft prior to
Sweig's introduction and had no immediate ability to contact Lord Ashcroft and present ABM's
purchase inquiry. Moreover, Sweig's long-standing relationship with Lord Ashcroft ensured that
ABM's offer to purchase OneSource would be considered by Lord Ashcroft.

**Answer:**     ABM denies that Slipsager had not previously met Lord Ashcroft and

affirmatively states that Slipsager and Lord Ashcroft had previously met telephonically. ABM

denies, upon information and belief, that Plaintiff has or had a long standing relationship with

Lord Ashcroft. Finally, ABM denies that Plaintiff in any way "ensured that ABM's offer to

purchase OneSource would be considered by Lord Ashcroft."

17.     In September of 2007, Sweig met with Slipsager in Chicago to discuss the
potential acquisition of OneSource by ABM. Slipsager confirmed that he had contacted Lord
Ashcroft and had discussed ABM's potential acquisition of OneSource. Slipsager assured Sweig
that he would receive a one percent (1%) business opportunity fee if the deal closed.

**Answer:**     ABM admits that Slipsager met with Plaintiff in Chicago in September

2007, and further admits that the general status of the OneSource transaction was discussed,

among other topics. ABM denies that "Slipsager assured [Plaintiff] that he would receive a one

percent (1%) business opportunity fee if the deal closed." ABM affirmatively states that Plaintiff admitted in an e-mail to Slipsager dated June 14, 2007 that he viewed working on acquisitions as "part of [his] job at ABM." ABM denies the remaining allegations in Paragraph 17.

18.     Thereafter, upon information and belief, Slipsager and Lord Ashcroft continued their discussions regarding ABM's acquisition of OneSource.

**Answer:**     ABM admits that Slipsager and Lord Ashcroft discussed the potential new business relationship between ABM and OneSource. However, ABM denies the implication that such discussions would not have occurred but for Plaintiffs' telephone call to Lord Ashcroft.

19.     OneSource, ABM and a wholly owned subsidiary of ABM entered into an Agreement and Plan of Merger, dated October 7, 2007, whereby ABM acquired OneSource for $365.0 million in cash, pursuant to a merger of OneSource into the wholly owned subsidiary of ABM.

**Answer:**     ABM admits that ABM and a wholly-owned subsidiary of ABM, and OneSource, entered into an Agreement and Plan of Merger dated October 7, 2007, whereby ABM agreed to acquire OneSource for $365 million in cash. However, ABM denies the implication that ABM's new business relationship with OneSource would not have occurred but for Plaintiffs' telephone call to Lord Ashcroft.

20.     On October 8, 2007, ABM issued a press release regarding its acquisition of OneSource. ABM's press release states:

SAN FRANCISCO AND BELIZE CITY, BELIZE, October 8, 2007 - ABM Industries Incorporated (NYSE: ABM), a leading facilities services contractor, and OneSource Services Inc. (London AIM: OSS) ("OneSource") announced today that they have signed a definitive agreement under which ABM will acquire OneSource for $365 million in cash. OneSource provides outsourced facilities services, including janitorial, landscaping, general repair and maintenance and other specialized services, for more than 10,000 commercial, industrial, institutional and retail accounts in the U.S.

The transaction combines two valuable facilities services platforms to create the scale, breadth and financial strength necessary to grow in the increasingly competitive and global service provider marketplace.

"We saw an opportunity to accelerate our growth strategy and we seized it," said Henrik Slipsager, ABM president and chief executive officer. "Consistent with our long-held commitment to increasing shareholder value, the acquisition of OneSource complements our strategy and further strengthens our growth prospects."

…

ABM expects to operate the combined company with annual run-rate cost synergies of between $45 and $50 million, which are expected to be fully implemented within 12 months after closing. The company expects to achieve $28 million to $32 million worth of cost synergies in fiscal year 2008, assuming a November 2007 closing. The synergies, which were identified jointly by the two companies, will be achieved primarily through a reduction in duplicative positions and back office functions, the consolidation of facilities and elimination of professional fees and other services.

ABM expects to realize tax benefits from acquiring net operating loss carry forwards of approximately $195 million and from deducting existing goodwill amortization, together expected to initially total $14 million in annual tax cost savings.

**Answer:**      ABM admits that it issued a press release regarding its new business

relationship with OneSource, and that said press release is quoted in part in Paragraph 20, but

denies the implication that ABM's new business relationship with OneSource would not have

occurred but for Plaintiffs' telephone call to Lord Ashcroft.

21.     ABM's acquisition of OneSource would not have occurred without the efforts of Sweig, and he was the procuring cause of that transaction. The $365 million acquisition of OneSource by ABM was a direct result of Sweig's efforts described above.

**Answer:**      Denied.

22.     As chief executive officer of a large, publicly traded company, and being experienced in prior merger and acquisition transactions, Slipsager knew or should have known that, by asking Sweig to use his long-standing relationship with Lord Ashcroft to begin a dialogue with Slipsager about ABM's potential acquisition of OneSource, Sweig would expect reasonable compensation in the event his efforts resulted in ABM's acquisition of OneSource.

**Answer:**      ABM denies the allegations in Paragraph 22. ABM affirmatively states

that Slipsager was without authority, actual or apparent, to enter into a verbal agreement for a

multi-million dollar finder's fee for a single telephone call, and that Plaintiff knew or should

8

have known of Slipsager's responsibility to seek board approval prior to entering into any such

agreement.

23.     As chief executive officer of a large, publicly traded company, and being experienced in prior merger and acquisition transactions, Slipsager also knew or should have known that when an individual, such as Sweig, introduces a party to another party for the purpose of effecting a purchase, it is customary to pay a reasonable finder's or business opportunity fee.

**Answer:**     ABM denies the allegations in Paragraph 23.  ABM affirmatively states

that Slipsager was without authority, actual or apparent, to enter into a verbal agreement for a

multi-million dollar finder's fee for a single telephone call, and that Plaintiff knew or should

have known of Slipsager's responsibility to seek board approval prior to entering into any such

agreement.

24.     A customary finder's or business opportunity fee under such circumstances is approximately one percent (1 %) of the purchase price of the acquired company.

**Answer:**     Denied.

25.     Following ABM's issuance of the November 8, 2007 press release, Sweig sent Slipsager an e-mail on October 8, 2007, stating:

> I am pleased that my calling Michael Ashcroft at your request on behalf of ABM and then arranging for the two [of] you to begin a dialog of ABM's potential acquisition of One Source, as well as my subsequent conversation with Michael and you about ABM's purchase of One Source has lead to ABM's potential acquisition of One Source.  As I strongly suggested when I made the first call to Michael, this would be a great acquisition for ABM which obviously the BOD [board of directors] of ABM agrees with.

**Answer:**     ABM admits that Plaintiff sent the e-mail quoted in Paragraph 25, but

denies the substance of the communication.  ABM further denies that it issued a press release on

November 8, 2007.

26.     On the same day, October 8, 2007, Slipsager responded by sending Sweig an e-mail.  Slipsager did not dispute Sweig's instrumental role in making an introduction to Lord Ashcroft that directly resulted in ABM's acquisition of OneSource. In his e-mail, Slipsager acknowledged that, after Sweig's introduction and Slipsager's and Lord Ashcroft's initial discussions, "things just developed."

**Answer:**        ABM denies that Slipsager stated or otherwise indicated that Plaintiff had an "instrumental role" in any part of the OneSource transaction.  ABM admits that Slipsager stated that "things just developed" in an e-mail to Plaintiff on October 8, 2007, but denies that that comment was an acknowledgement of anything having to do with Plaintiff and denies all of the remaining allegations in Paragraph 26.

27.    Sweig has requested that he be compensated by ABM for the reasonable value of his services through the payment of a customary finder's or business opportunity fee.

**Answer:**        ABM denies that Plaintiff, an ABM employee, requested compensation when he voluntarily offered to call Lord Ashcroft.  ABM affirmatively states that Plaintiff admitted in an e-mail to Slipsager dated June 14, 2007 that he viewed working on acquisitions as "part of [his] job at ABM."  ABM admits that Plaintiff requested compensation—for the first time—just prior to the commencement of the instant action against ABM.

28.    ABM rejected Sweig's requests and refused to pay Sweig a customary finder's or business opportunity fee for Sweig's efforts described herein in connection with ABM's acquisition of OneSource.

**Answer:**        ABM admits the allegations in Paragraph 28 to the extent they refer to any compensation in addition to that which is provided under his written Sales and Marketing Agreement with ABM.

29.    On November 14, 2007, ABM announced the completion of its acquisition of OneSource. In a press release issued on November 14, 2007, ABM stated:

SAN FRANCISCO--(BUSINESS WIRE)----ABM Industries Incorporated (NYSE:ABM) today announced the completion of its previously announced acquisition of OneSource Services Inc. (London AIM:OSS) for $365 million in cash.

'We are very pleased to complete this transaction, which provides value to shareholders, service to customers and opportunities for employees,' said Henrik Slipsager, ABM president and chief executive officer.  'We welcome our new colleagues to ABM as we work to accelerate our growth strategy.'

**Answer:**    ABM admits that it issued a press release regarding its new business relationship with OneSource, and that said press release is quoted in part in Paragraph 29, but denies the implication that ABM's new business relationship with OneSource would not have occurred but for Plaintiffs' single voluntary telephone call to Lord Ashcroft.

## COUNT I
## BREACH OF CONTRACT

30.    Sweig restates, realleges and incorporates by reference Paragraphs 1 through 29 as and for this Paragraph 30.

**Answer:**    ABM incorporates by this reference its answers to the allegations stated in Paragraphs 1 through 29.

31.    ABM and Sweig entered into an oral agreement whereby ABM agreed to pay Sweig a customary finder's or business opportunity fee for Sweig's efforts described herein in connection with ABM's acquisition of OneSource.

**Answer:**    Denied.

32.    The customary finder's or business opportunity fee for Sweig's efforts described herein in connection with ABM's acquisition of OneSouree is one percent (1%) of the $365 million purchase price paid by ABM for OneSource, or $3.65 million.

**Answer:**    Denied.

33.    ABM breached its agreement with Sweig by, among other things, refusing to pay Sweig a customary finder's or business opportunity fee for Sweig's efforts described herein in connection with ABM's acquisition of OneSource.

**Answer:**    Denied.

34.    Sweig has performed all of his obligations under the parties' agreement.

**Answer:**    ABM denies the existence of an oral finder's fee agreement and, therefore, denies Paragraph 34.

35.    As a result of ABM's breach of the parties' agreement, Sweig has been damaged in the amounts set forth above and in additional amounts to be determined at trial.

**Answer:**    Denied.

WHEREFORE, ABM respectfully requests entry of judgment in its favor on Count I and such further relief as the Court finds just and appropriate.

## COUNT II
## QUANTUM MERUIT--CONTRACT IMPLIED-AT-LAW

36.     Sweig restates, realleges and incorporates by reference Paragraphs 1 through 29 as and for this Paragraph 36.

**Answer:**     ABM incorporates by this reference its answers to the allegations stated in Paragraphs 1 through 29.

37.     Sweig pleads Count II in the alternative to Count I, and any contradictory statements or allegations shall not be deemed an admission of facts stated herein.

**Answer:**     Denied.

38.     Through Sweig's efforts, Slipsager was introduced to Lord Ashcroft and engaged in discussions with Lord Ashcroft about ABM's acquisition of OneSource.

**Answer:**     Denied.

39.     Sweig's ability to place Slipsager in contact with Lord Ashcroft was a result of Sweig's long-standing relationship with Lord Ashcroft. Sweig was under no obligation to leverage this relationship for ABM's benefit.

**Answer:**     Denied.

40.     Aside from his entitlement to a reasonable finder's fee, Sweig did not stand to gain anything by contacting Lord Ashcroft directly, presenting ABM's business proposal, and arranging discussions between Slipsager and Lord Ashcroft. Furthermore, aside from his entitlement to a finder's fee, Sweig stood nothing to gain through ABM's eventual purchase of OneSource.

**Answer:**     Denied.

41.     As a direct and proximate result of Sweig's efforts, Slipsager and Lord Ashcroft engaged in negotiations that resulted in ABM's purchase of OneSource for $365 million.

**Answer:**     Denied.

42.     Sweig's efforts conferred a substantial benefit upon ABM, and as a result there exists a contract implied-at-law for the reasonable value of the services performed by Sweig.

**Answer:**     Denied.

CHI1 1503561v.5

43.     Sweig is entitled to receive a customary finder's or business opportunity fee from ABM for Sweig's efforts described herein in connection with ABM's acquisition of OneSouree.

**Answer:**     Denied.

44.     The customary finder's or business opportunity fee for Sweig's efforts described herein in connection with ABM's acquisition of OneSource is one percent (1%) of the $365 million purchase price paid by ABM for OneSource, or $3.65 million.

**Answer:**     Denied.

45.     ABM has refused to pay Sweig a customary finder's or business opportunity fee for Sweig's efforts described herein in connection with ABM's acquisition of OneSource.

**Answer:**     ABM admits the allegations in Paragraph 45 to the extent they refer to

compensation in addition to that which is provided under Plaintiff's Sales and Marketing

Agreement with ABM.

46.     It would be unjust and inequitable to permit ABM, a multi-billion-dollar company, to unfairly retain the benefit of Sweig's valuable efforts without paying Sweig a customary finder's or business opportunity fee.

**Answer:**     Denied.

47.     As a result of ABM's improper refusal to pay Sweig a customary finder's or business opportunity fee, Sweig has been damaged in the amounts set forth above and in additional amounts to be determined at trial.

**Answer:**     Denied.

WHEREFORE, ABM respectfully requests entry of judgment in its favor on Count II and

such further relief as the Court finds just and appropriate.

## **AFFIRMATIVE DEFENSES**

### **First Affirmative Defense**

Plaintiff's contractual relationship with ABM is defined and limited by the terms of his

Sales and Marketing Agreement with ABM, which is identified in Paragraph 7 of the Complaint.

The Sales and Marketing Agreement covers the services allegedly rendered by Plaintiff in this

case, and Plaintiff has received full compensation under the terms of his Sales and Marketing Agreement. Plaintiff's purported claim is therefore paid, satisfied, waived, and released.

### Second Affirmative Defense

Plaintiff's contractual relationship with ABM is defined and limited by the terms of his Sales and Marketing Agreement with ABM, which is identified in Paragraph 7 of the Complaint. The Sales and Marketing Agreement covers the services allegedly rendered by Plaintiff in this case, and Plaintiff has received full compensation under the terms of his Sales and Marketing Agreement. Plaintiff's purported side agreement for a finder's fee therefore fails for lack of consideration.

### Third Affirmative Defense

The services allegedly rendered by Plaintiff in connection with the OneSource transaction were of nominal value to ABM. Accordingly, assuming in the alternative that the purported multi-million dollar oral finder's fee agreement was made, it would fail for lack of consideration.

### Fourth Affirmative Defense

ABM did not at any time offer or agree to pay any compensation to Plaintiff in connection with the OneSource transaction. To the extent Plaintiff understood that ABM orally agreed to pay a multi-million dollar finder's fee to Plaintiff for voluntarily placing a single telephone call to Lord Ashcroft (which ABM contends is unreasonable), his understanding could only have arisen as a result of mistake. Accordingly, Plaintiff's claim fails as no agreement exists between the parties.

DATED: July 14, 2008                    Respectfully Submitted,

                                        ABM INDUSTRIES INCORPORATED


                                        By:_____/s/ Simon Fleischmann_____
                                               One of its attorneys

Jennifer A. Kenedy (6216342)
Simon Fleischmann (6274929)
LOCKE LORD BISSELL & LIDDELL LLP
111 South Wacker Drive
Chicago, IL 60606
Telephone: 312.443.0462
Facsimile: 312.896.6471

CHI1 1503561v.5

## <u>CERTIFICATE OF SERVICE</u>

I, Simon Fleischmann, an attorney, certify that I caused a true and correct copy of the foregoing Answer and Affirmative Defenses to be served all persons registered and authorized to receive such service through the Court's Case Management/Electronic Case Files (CM/ECF) system on July 14, 2008.

_____/s/ Simon Fleischmann_____
Simon Fleischmann

CHI1 1503561v.5